IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 25-160-RGA |
| | ) | |
| TERRENCE HICKSON, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM ORDER

I held a suppression hearing on Defendant's motion to suppress. (D.I. 21). Two witnesses, DEA Special Agent Kruskall and DSP Detective Triantos, testified. They were both credible. I make the following factual findings.

Defendant, Terrence Hickson, twice sold large quantities of controlled substances to a DEA confidential informant in "controlled buys." Those sales were on August 7, 2025, and August 22, 2025. (Tr. 6, 8).[1] One of the meetings was video-recorded. (Tr. 20-21).

For the August 7th sale, Defendant came alone and delivered a pound of crystal methamphetamine to the CI. (Tr. 9). Defendant was operating a black Kia sedan. (Tr. 9). During the build-up to the sale, DEA agents listened "in real time" to communications between the CI and Defendant, during which the CI and Defendant set up the time and place for the delivery. (Tr. 6-8). DEA agents surveilled the transaction. (Tr. 7).

For the August 22nd sale, Defendant again came alone and, this time, delivered 14 ounces of crystal methamphetamine and 2 ounces of fentanyl to the CI. (Tr. 10). Defendant was operating a silver Chevy Impala. (Tr. 10). DEA agents again listened "in real time" to pre-

---

[1] References to "Tr. ___" refer to the transcript of the suppression hearing.

meeting communications between the CI and Defendant setting up the time and place of the meeting. (Tr. 6-8). DEA agents surveilled the transaction. (Tr. 7).

During various surveillances, law enforcement determined that the silver Chevy Impala was Defendant's primary vehicle, since it was registered to him and they saw him driving it "the majority of the time." (Tr. 11).

The DEA had a GPS tracker installed on Defendant's silver Chevy Impala starting on August 29, 2025, which was renewed in October 2025, and which was active until Defendant's arrest. (Tr. 12, 17).

The CI called Defendant in October 2025 via a cell phone. (Tr. 12). The DEA was able to listen to the phone calls between the CI and Defendant as they happened. (Tr. 12-13). The CI initially requested a specific amount of drugs from Defendant, although other amounts were discussed in subsequent conversations. (Tr. 12). On October 29, 2025, the CI and Defendant agreed on the amount of drugs to be delivered. (Tr. 13). The CI and Defendant agreed that the delivery would be the next day, October 30, 2025. (Tr. 13). During the morning of October 30th, Defendant told the CI that he had "one of each," referring to cocaine and methamphetamine,[2] and that he had the drugs with him, and that he "was, in fact, on his way. (Tr. 13, 15-16, 18, 20, 22). The DEA understood, based on experience and the course of events and communications between the CI and Defendant, that "one of each" meant a pound of each. (Tr. 14-15, 23-24). The GPS tracker showed that Defendant "was traveling in the direction" of the agreed-upon meeting place for the drug deal, which was at a specific business parking lot in Camden,

---

[2] Agent Kruskall understood the drugs to be cocaine and methamphetamine based in part on references to "Carl" and "Mike" in the communications between the CI and Defendant. (Tr. 20).

Delaware. (Tr. 18, 25, 29). The DEA had enlisted the DSP to make a traffic stop of Defendant and advised DSP that Defendant had said he was on his way. (Tr. 16, 28).

The Delaware State Police aided the DEA's investigation. On October 30th, DSP units were set up to intercept Defendant's vehicle on its way from Milford, Delaware, to Camden, Delaware. (Tr. 29). Around midday, Detective Triantos stopped the silver Chevy Impala with Defendant in it in Frederica, Delaware, about eight to ten miles from Milford and about fifteen minutes away from Camden. (Tr. 22, 25-26, 29, 31-32). Detective Triandos stopped the Chevy Impala after he had personally observed two very minor traffic violations.[3] (Tr. 31-32). He had a fellow officer who had a drug dog. The dog did a "free air sniff" and gave a positive indication.[4] (Tr. 36). Detective Triandos thereafter searched the vehicle, seizing various suspected drugs, three phones and a money counting machine. (Tr. 36-37).

The Government intends to use the evidence that Detective Triandos seized to make its case against Defendant.

I make the following conclusion of law.

The DEA had developed probable cause to believe that Defendant would be transporting controlled substances, to wit, methamphetamine and cocaine, in his silver Chevy Impala to

---

[3] I believe Detective Triandos witnessed the two violations he saw. I am quite skeptical that anyone ever gets pulled over for the violations unless there is some other reason for the traffic stop, as there was here. In any event, the Government does not rely on the violations to justify the stop.

[4] I think the Government is not relying upon the drug dog sniff. In its Opposition, submitted before the hearing, the Government did rely upon it, but also represented that it "will present evidence of the dog and handler's certifications at the evidentiary hearing." (D.I. 25 at 8 n.2). No such evidence was offered at the hearing. If the Government were still relying upon the dog sniff, I would find the Government offered no evidence in support of the reliability and experience of the handler/dog combination. I would consider the evidentiary value of the dog sniff to be non-existent. In any event, I attribute no weight to the dog sniff in the probable cause calculus.

deliver to the CI at a prearranged meeting in Camden, Delaware. Defendant told the CI that he was on his way and that he had the drugs. When law enforcement stopped the vehicle on what was the way to Camden, there was probable cause to search it for controlled substances. The evidence seized by the DSP was therefore lawfully obtained.[5] The motion to suppress (D.I. 21) is DENIED.

IT IS SO ORDERED this 30th day of July 2026.

United States District Judge

---

[5] After the suppression hearing, counsel for Defendant hinted at an alternative theory for suppression. (Tr. 42-43). Defendant's subsequent memo did not address the theory. (D.I. 28). While the theory was not fully explained, it sounded to me like an extremely doubtful theory, and, more importantly, it has been waived.